## DAVIS v. COMMONWEALTH LAND & LUMBER CO. et al.

### (Circuit Court, E. D. Kentucky. February 17, 1905.)

1. BOUNDARIES—LOCATION—GENERAL RULES.

   The Kentucky decisions do not establish any hard and fast rule requiring the intervening lines of a boundary of land, connecting extant corners and the nonextant corners at their points of intersection with each other, to be located by running the lines according to the courses called for whenever it is possible to do so; but the rule is that they should be so located unless there is some circumstance bringing the mind to a contrary conclusion, and it is established by such decisions that in case of a boundary consisting of four lines, two of the corners of which are extant and connected by one of the lines, a mistake in the call for the course of such line, and the necessity of preserving the shape or figure of the boundary as shown by the original plat, are sufficient circumstances to justify and require a departure from the course called for as to the opposite line.

2. SAME—RUNNING LINES IN REVERSAL.

   Under the rule of the Kentucky decisions the running of lines backward and in reverse order in making a location of lost corners in a boundary may be resorted to only when it is proper under all the circumstances to locate the lines of such portion of the boundary in accordance with the courses called for, and they cannot be so located without resorting to such reversing process; and in such case it should be resorted to only to the extent necessary to accomplish such purpose.

3. SAME—LOST CORNERS—RELOCATING.

   A boundary consisted of six lines, its general shape, however, as shown by the plat of survey, being that of a quadrilateral, bordering on a nonrectangular parallelogram with the third and fifth sides and the fourth and sixth sides, respectively, opposite each other. The course of the third side as located varied from that given in the call. The fifth and sixth corners, and the fourth, fifth, and sixth sides, could not be located on the ground; it appearing that such lines were never in fact actually run. *Held*, under all the circumstances shown, and keeping in view the preservation of the shape of the tract as shown by the plat, that the lost corners should be located by running the fourth line from the fourth corner the course and distance called for, thus establishing the fifth corner, by running the sixth line backward from the beginning corner on its course reversed and for the distance called for, and running the fifth side from the fifth to the sixth corner as so established, making such side the only one of the three which varied from the course or distance called for.

In Equity. Suit to quiet title.

Frank Chinn, D. W. Lindsey, and William Ayres, for Charles H. Davis.

Helm, Bruce & Helm and W. F. Hall, for Commonwealth Land & Lumber Co.

COCHRAN, District Judge. The former opinion herein (141 Fed. 711) left open for final decision three matters, to wit: (1) The true location of the fourth corner of the Ledford patent on the top of Cumberland Mountain. (2) The true location of the fifth and sixth corners, and the fourth, fifth, and sixth lines, thereof. (3) The location of the patents senior to the Ledford patent. Since then the depositions of the two surveyors, Will Ward Duffield and James E. Kirby, have been retaken, and the matters left open reargued orally

and on brief. After due consideration I have reached the following conclusions in regard to said matters:

As to the first matter, I conclude that the fourth corner should be located 724.40 poles from the monument in Cumberland Gap marking the corner between the three states of Kentucky, Virginia, and Tennessee. This conclusion accepts the measurement of the third line of 8,320 poles on the top of Cumberland Mountain by Mr. Duffield as correct, and the distance of said fourth corner from said monument should be according to said measurement. Both sides accept that measurement as the more correct one. I was led in former opinion to indicate a preference for Mr. Kirby's measurement in this particular by an indisposition to get farther away from the fourth corner as formerly fixed by this court than I had to.

In order to fully justify the conclusion I have reached in regard to the second matter, an extended consideration of it is necessary. In the former opinion I indicated that there were five possible ways of locating the fifth and sixth corners, and the fourth, fifth, and sixth lines, of the Ledford patent. They were as follows, to wit: (1) Run fourth and fifth lines the courses and distances called for, and then connect the end of the fifth line with the beginning corner. The fifth and sixth corners will be the ends of the fourth and fifth lines thus run. (2) Run the fourth line the course and distance called for, and the sixth line the reverse of the course called for and the distance called for, and then connect the ends of these two lines. The fifth and sixth corners will be the ends of said two lines. (3) Run fourth line the course and distance called for, fifth the course called for, and the sixth line the reverse of the course called for, and extend fifth and sixth lines until they intersect. The fifth corner will be the end of the fourth line so run, and the sixth corner will be the intersection of the fifth and sixth lines so run. (4) Run the fifth and sixth lines in reverse order, the sixth line the reverse of the course and the distance called for, and the fifth line the reverse of the course called for, extending it until it strikes the fourth line run the course called for. The fifth corner will be the intersection of the fifth and fourth lines so run, and the sixth corner will be the end of the sixth line so run. (5) Run the fourth line the course called for, and the sixth line the reverse of the course called for, and shorten the one and lengthen the other proportionately in order that their ends may be connected by the fifth line run according to course called for. The fifth and sixth corners will be the ends of the fourth and sixth lines so shortened and lengthened. I might have said that there is another and sixth way of locating said corners and lines, to wit: Run the sixth and fifth lines in reverse order, and the reverse of the courses and the distances called for, and then connect the ends of the fifth line with the fourth corner. The fifth and sixth corners will be the ends of the fifth and sixth lines so run.

The third, fourth, and fifth ways preserve the courses called for as to all the lines. The third and fourth preserve also the distance called for as to one of them; that preserved by the third being the distance of the fourth line, and that preserved by the fourth being the distance

of the sixth line—the two ways thus being opposites. By the fifth the distance of neither of the lines is preserved. The first, second, and sixth ways preserve the course and distance of two of the lines, and neither course nor distance of the other line. By the first it is the sixth line that is not so preserved. By the second it is the fifth line, and by the sixth it is the fourth. The first and sixth ways are opposites.

In saying that there are these six possible ways of locating the Ledford patent, I do not mean to be understood as holding that, after due weight is given to all the relevant facts and considerations, there are six different ways in which it is possible to locate said patent. If that were true, then, as suggested by counsel for T. J. Asher, who is interested in the location of said patent, though not a party to the suit, it might be said that the patent is void for uncertainty. What I mean is that there are these six possible hypotheses as to the true location of said patent to which the relevant facts and considerations may be applied to determine which is the correct one. I hold that from these facts and circumstances the correct hypothesis can be determined, and after it is determined there is no other possible way in which to locate the patent, giving due weight thereto. Which, then, of these six hypotheses is the correct one? The fifth one may be dismissed from our consideration without more to do. The defendant contends that the fourth hypothesis is the correct one, and plaintiff seems to be content with the adoption of either the first, second, or third. This eliminates the sixth. The choice, then, lies between the first four.

We are met here again by the decision of the Court of Appeals of Kentucky in the case of Creech v. Johnson, 76 S. W. 185. Counsel for defendant urge that that decision settles that the fourth hypothesis is the correct one and should be followed here, unless it can be shown that it is clearly a mistake. It is questionable whether such is the true effect of that decision. It is certain that it decided no such thing. What it decided was that the three lines in question should be run in reverse order and each one the reverse of the course called for. So doing would not only locate the three lines and two corners now in question, but also locate the third line as to length and the fourth corner, and in so doing said lines would be run the reverse of the courses called for, and the fifth and sixth also the distance called for: the only departure from the calls of the patent being in the reverse running and as to the distance of the fourth line. The fourth hypothesis differs from this location in three particulars. It starts out with the fourth corner already fixed and has nothing whatever to do with locating it. Again, the reversing process is not kept up from the beginning corner to the top of Cumberland Mountain. It stops with the fifth line, thus limiting that process to the fifth and sixth lines. The fourth line is run the course called for. And, again, the fifth line is not run according to distance called for. Its distance is lengthened the extent required in order to connect with the fourth line so run. It is in view of these differences that it occurs to me to

say that there may be a question as to whether any such effect can be given to the decision in that case, or, in other words, as to whether the Court of Appeals would have decided in favor of the fourth hypothesis, had it been of the opinion that its location of the patent was wrong and the fourth corner thereof should be located as heretofore determined herein. If any such effect can be given to it, it can only be because a decision that the reversing process should apply to the three lines with a shortening of the fourth is a decision that, if that is not correct, it should be applied to two of them with a lengthening of the fifth and a greater shortening of the fourth, or because the general principles which it was thought required the one location in fact require the other. But, conceding that such an effect can be properly given to the decision, I do not think I am any more affected by the decision to this extent that I was affected by its location of the patent. This matter I have covered in the former opinion. The authorities there referred to establish that the principles applicable to this case are rules of property, and in so far as they have been settled and determined by decisions of the Court of Appeals of Kentucky other, than in cases involving the patent in question herein, this court is bound thereby. But it is not bound by the decision in Creech v. Johnson as to the principles applicable to the location of the Ledford patent, or as to their application thereto. For it to be so bound would be to hold that one can be estopped by a judgment in a proceeding to which he was no party, when it is an invariable rule that, in order for one to be estopped by a former judgment, he must have been a party thereto. This applies as well to a partial estoppel as to a complete estoppel. One is not bound to any extent by a judgment to which he was no party. He is therefore not bound thereby, unless he can show that the judgment was clearly a mistake. The statement in the case of Preston v. Bowmar, 6 Wheat. 580, 5 L. Ed. 336, that the judgment of the state court should be followed unless it could be pronounced unreasonable or founded in clear mistake, had application to a case where the parties in the federal court were the same as those in the state court, but for technical reasons the judgment of the latter court was not an estoppel. So much, then, as to the value of the decision in Creech v. Johnson in favor of the fourth hypothesis.

We come, now, to a consideration on the merits of the question as to which of these first four hypotheses is the correct one. By the fourth hypothesis, as stated, the fifth and sixth lines are run in reverse order and the reverse of the courses called for, and by the second and third hypotheses the sixth line is run the reverse of the course called for, by the second the distance called for, and by the third the distance necessary to strike the fifth line run the course called for. Each one of these three hypotheses, therefore, makes use to a more or less extent of the reversing process. This being so, it is important to understand just when it is proper to resort to the reversing process to any extent in locating those lines of a boundary of land which intervene between extant corners thereof, the corner or corners at whose points of connection with each other are nonextant.

The relevant decisions of the Kentucky Court of Appeals in cases other than Creech v. Johnson are conclusive as to this, as has been already intimated. But it will clear the way for their consideration to first ascertain what rule on the subject prevails in other jurisdictions. Judge Hobson, in his opinion in Creech v. Johnson, cites the decision of the Supreme Court of North Carolina in the case of Harry v. Graham 18 N. C. 76, 27 Am. Dec. 226, referred to in the former opinion herein on another point, in addition to certain Kentucky decisions in support of the resort therein made to the reversing process. In view of this and of the lucidity of Chief Justice Ruffin's opinion, the decision in that case on this subject affords a good starting point from which to begin a consideration of relevant decisions in other jurisdictions. That case involved the location of only two lines intervening between extant corners and of a single nonextant corner at the point of connection of said two lines with each other. The extant corners between which said two lines intervened were the second, a chestnut oak and red oak, and the fourth, a post oak; the two intervening lines were the second and third; and the nonextant corner at their point of connection with each other was the third—a black oak. The calls for said two lines were as follows, to wit: From the chestnut oak and red oak "N. 45° W. 220 poles, to a black oak near Mr. Graham's own line; thence N. 45° E. 220 poles," to the post oak. The significance of the word "near" in locating the third or black oak corner and said two lines was considered in the former opinion. The extant corners could not be connected by running said two lines from the second one according to the courses and distances called for. To make the connection a departure from the calls to a certain extent was necessary. It was held that it should be made by running the two lines in the order called for, the second according to course and distance called for, the end of which would be the third corner, and the third line therefrom to the fourth corner the course and distance necessary to reach it, thus departing from the call for that line as to both course and distance. It was urged that the connection should be made by resorting to the reversing process. Of course, it could not be made by running the two lines in reverse order and the reverse of the courses and the distances called for. The way in which it was urged that the reversing process should be used was to run the third line from the fourth corner the reverse of the course called for, the end of which would be the third corner, and the second line from said corner to the second corner, the course and distance necessary to reach that corner. There was another way of making the connection which made use of the reversing process, though not to as great extent as the other way, but which seems not to have been considered. It was to run the second line from the second corner the course called for, and the third line from the fourth corner the reverse of the course called for, and to extend both lines until they intersected. This involved a departure from the calls as to both lines as to distance. According to this the third corner would be the point of intersection between said two lines thus run. The decision, however, as to how the connection should

be made was against this way as well as against the other, which seems to have been the only one urged. The argument which led the court to the conclusion which it reached was made up of two propositions. One was as to the value of the order in which the lines were called for  Concerning this Judge Ruffin said:

"The natural order of survey is that which the deed shows the parties to the deed adopted to identify to their own satisfaction the land intended to be conveyed by the one to the other. It may be considered as their directions how the identity shall be established by survey at any future time and it supposes certain points, as the beginning, to be established."

The other was as to the value of a call for course and distance. Concerning this he said:

"Course and distance from a given point is a certain description in itself, and therefore is never departed from, unless there be something else which proves that the course and distance stated in the deed were thus stated by mistake."

But, whilst it was held that the case in hand was not one where resort could properly be had to the reversing process in locating said two intervening lines and single nonextant corner, it was conceded that there were cases where it would be proper to resort thereto in locating lines intervening between extant corners and nonextant corners at their points of connection with each other. Concerning the contingency in which it would be proper so to do, Judge Ruffin said:

"The party cannot have recourse to that method of ascertaining a previous line in the order of description, unless by reversing he gives a more certain means of identifying the prior line than the deed gives in its description of the line itself."

And again:

"If, therefore, the description of a particular line be complete in itself, the court cannot vary from that description because it will not correspond with the description of the posterior line, unless the description of the latter be more specific than the former, and unless from the latter a mistake in the former can be inferred."

In the first quotation he said that resort may not be had to the reversing process, unless it "gives a more certain means of identifying the prior line than the deed gives in its description of the line itself"; in the second, that it may not be had "unless the description of the latter [posterior line] be more specific than the former [prior line], and unless from the latter [posterior line] a mistake in the former [prior line] can be clearly inferred." He illustrated the position thus taken in these words:

"For example, if this deed had said that the line from the corner, chestnut oak and red oak, ran to a black oak near the patentee's other line, and gave neither course nor distance, or only one, and then, etc. (as in the call), the line might be reversed from the post oak to ascertain the corner of that and the next preceding line, because that affords the only evidence (the black oak not being found or its locality otherwise identified) of the point at which the one line terminated and the other began. So if, even upon such calls as this present deed contains, a line of marked trees were found by tracing the line back from the post oak corresponding with the survey for the 300-acre

patent, that might carry the other line to the point of intersection, because it proves an actual survey and the evidence of permanent natural objects to show where the black oak once actually stood, which, wherever it stood, would be the terminus and control the distance mentioned in the deed."

According to this position, therefore, resort may be had to the reversing process to make such location, if the posterior line has an advantage over the prior line in point of certainty and cannot be had unless such is the case. The advantage may go so far, as in the first of the two examples referred to, that the location cannot be made without resorting to the reversing process. This, however, is not essential. It is sufficient that in some particular the advantage in point of certainty exists. In the absence of such advantage, the value of the order called for and of a call for course and distance is such that the one and the other, so far as possible, should be adhered to. That such is the reasoning upon which the position taken is based appears from the words in which Judge Ruffin announced his conclusion, which are as follows:

"But there is no such evidence in this case, and in the absence of it there is nothing more to show that the mistake was made in the description of the second line than it exists in that of the third line. A mistake was certainly made in the one or the other. In which? is the question. The one line has a certain beginning and the other has a certain ending, and they meet at the same point, and that point of meeting is uncertain. It cannot be rendered more certain by running it from either of the given points, and therefore we are not at liberty to resort to the description of the latter line to control that of the prior line, but must lay down the prior one from its own description. Because it is prior it controls the next line, since that begins where the other ends."

This decision of the Supreme Court of North Carolina has been followed by a number of other decisions in the same jurisdiction, amongst which may be cited the decisions in the following cases, to wit: Safret v. Hartman, 52 N. C. 203; Norwood v. Crawford, 114 N. C. 513, 19 S. E. 349; Duncan v. Hall, 117 N. C. 443, 23 S. E. 362.

In the case of Safret v. Hartman, Pearson, C. J., in referring to the decision in Harry v. Graham, said:

"It is decided in that case that a posterior line could not be reversed, in order by its intersection with the prior line to show the corners, unless such posterior line was certain, because to do so would be to extend the distance of the prior by the course of the posterior line. The claim of mistake resting on the one or the other being equal, it was deemed proper to follow the order in which the survey was made."

He said that resort could not be had to the reversing process "unless such posterior line was certain."

In the case of Norwood v. Crawford, Judge Avery said:

"Where by running with the calls a different result from that attained by reversing is necessarily reached or may ensue, the safer and more certain method of following the order of the original survey by the interested parties who directed it is as a rule adopted. We find no case in our Reports where this court has given its sanction to the correctness of a survey made by reversing the line from a known beginning corner. The rule is to run with the calls in regular order from a known beginning, and to resort to the test of reversing in the subsequent progress around the boundary only where the

terminus of a call cannot be ascertained by running forward, but can be fixed with absolute certainty by running reversely the next succeeding line."

And again:

"The invariable rule seems to require that the lines shall be run from a known beginning, according to the direction and distance, if given, in the order in which the parties originally ran and arranged them; but if a call is reached in the regular order which by a failure to specify distance or by fixing the corner on a line of another tract makes its terminus uncertain, and by reversing the next succeeding line and from a known point the location of the line or point called for can be made certain, then that mode of surveying becomes proper only because it plainly tends to the attainment of the leading object in making all surveys—certainty of location. If, for instance, the first call in the deed by which the surveyor ran had been for a point in the line of another tract, and thence with said line a given distance to a third corner, which was admitted to be at a certain point on second line, it would have been proper to have reversed the call from the third corner, so as to ascertain the point at which a prolongation of the first line would intersect with that of the adjacent tract. The same course would be pursued, and for a similar reason, where in the case supposed course, but not distance, was given in the first call, and the line of the adjacent tract was known to be marked from the third corner to a point at which, running by course, the first line would intersect it."

In the first of these two quotations he said that resort could be had to the reversing process "only where the terminus of the call cannot be ascertained by running forward, but can be fixed with absolute certainty by running reversely the next succeeding line"; and, in the second, that it can be had "if a call is reached in the regular order which either by failure to specify distance or by fixing the corner on a line of another tract makes the terminus uncertain, and by reversing the next succeeding call from a known point the location of the line or point called for can be made certain." This would seem to limit the right to resort to said process to a case coming within the first example stated by Judge Ruffin in Harry v. Graham in illustration of the position taken by him therein.

In the case of Duncan v. Hall, Judge Avery said:

"In determining which is correct, the courts proceed upon the idea that the object of legal investigation and inquiry is to find the lines and corners and monuments which were agreed upon by the parties to the original conveyance, and that in order to attain that object the lines should be run in the direction and order adopted by them. There are some exceptional instances in which it is manifest that reversing a line is a more certain means of ascertaining the location of a prior line than the description of such prior line given in the deed, but such cases are rare exceptions to a well-established general rule. The general rule is an established law of evidence, adopted as best calculated to ascertain what was the intention to be conveyed; and it is incumbent on a party asking the courts to depart from it to show facts which bring the particular case within the exceptions to the rule."

Here he said that resort could be had to the reversing process if it was a "more certain means of ascertaining the location of a prior line than the description of such prior line given in the deed." The position thus taken is substantially that taken in Harry v. Graham. It will be noted that it is laid down that cases where resort should be had to the reversing process "are rare exceptions to a well-established general rule."

This line of decisions gives us the North Carolina rule on the subject. It is not necessary to consider the decisions in other jurisdictions in like detail; for 5 Cyc. p. 878, undertakes to state the rule to be deduced from all the decisions on the subject, which is substantially the same as the North Carolina rule. It uses these words:

"Where a disputed or lost line or corner can thereby be established more nearly in conformity with the terms of the instrument and with the intent of the parties as gathered therefrom, it is competent to ascertain such line or corner by first ascertaining the position of some other bound and tracing the back line from that by reversing the course and distance; but a line will not be reversed for the purpose of showing the termination of a prior line, unless the description of the posterior line is more definite than that of the prior line, and a mistake in the prior line can be clearly shown."

An illustration as to where resort may be had to the reversing process because the posterior line has an advantage over the prior line in point of certainty different from those given in Harry v. Graham may be found in the case of Swenson v. Willsford, 84 Tex. 424, 19 S. W. 613. It involved the location of the boundary of a four-sided body of land on the east side of the Colorado river, known as "survey No. 52." The boundary began at the southwest corner of survey No. 53, on the east bank of said river, and ran thence down the river with its meanders to the northwest corner of survey No. 51, thence east 7,411 varas, thence north 2,450 varas, and thence west 8,098 varas, to the beginning. The north line of the survey, as thus called for, was 8,098 varas, and that of the south line 7,411 varas. The northwest and southwest corners on the river were known. If the boundary was located by running the calls in direct order, the north line was 1,000 varas longer than called for; and if by running them in reverse order, the south line was 1,000 varas shorter. The question was as to the order in which the lines should be run, and hence which line should yield, whether the south or prior line, or the north or posterior line. It was held that the lines should be run in reverse order, and that the south or prior line should yield. It was so held because the evidence was that the north or posterior line had been actually run at the time of the survey, and the south or prior line had not been so run. In affirming the judgment of the lower court, Tarlton, J., said:

"There was evidence tending to show that the north line, which the court, disregarding the order of the calls in the field notes, chose to follow in fixing the survey preferably to the south line, was actually surveyed; whereas it is certain that the south line was never actually traced by the surveyor. The court, it is fair to infer, was influenced in its conclusion by this evidence, and applied the rule requiring it to follow in the footsteps of the surveyor."

The case of Ayers v. Watson, 137 U. S. 584, 11 Sup. Ct. 201, 34 L. Ed. 803, referred to in the former opinion, would seem to come within the first example stated by Judge Ruffin in Harry v. Graham, which is a case where the boundary cannot be located by pursuing the direct order, but can be located by pursuing the reverse order. Mr. Justice Bradley said:

"The judge was right in holding as he did, and in instructing the jury that the beginning corner of a survey does not control more than any other corner

actually well ascertained, and that we are not constrained to follow the calls of the grant in the order said calls stand in the field notes, but are permitted to reverse the calls and trace the lines the other way, and should do so whenever by so doing the land embraced would most nearly harmonize all the calls and the objects of the grant. If an insurmountable difficulty is met with in running the lines in one direction, and is entirely obviated by running them in the reverse direction, and all the known calls of the survey are harmonized by the latter course, it is only a dictate of common sense to follow it."

In running the lines of the boundary involved in that case in direct order, an "insurmountable difficulty" was met with. The west line from the pecan tree, the beginning corner on the river, and the north line from the end thereof, could be run according to the courses and distances given in the boundary; but the northeast corner, two small hackberries, called for as the end of the second or north line, and the easterly line from that corner to the box elder tree on the river, could not be found. It was necessary to find that corner and line in order to locate the boundary. The difficulty of finding them was insurmountable by running the lines in direct order. In that condition of things a random line was run across the front of the boundary from the western line the distance usually taken for an 11 league survey— the size of the survey in question—and a blazed line running north and south was found. This line was followed south to the river, where was found the box elder tree. Starting from this corner and running north or backwards the distance called for the easterly line, two small hackberries, each marked on the inside with old blazes facing each other, were found. The hackberries were 4,000 varas short of reaching the point where the second line terminated, running in direct order. It was held that the boundary should be located by running the lines in reverse order, thus shortening the first line 4,000 varas.

It is now time to take up the relevant Kentucky decisions, other than Creech v. Johnson, and ascertain what rule they lay down on the subject. Judge Hobson, in that case, as justifying the use therein made of the reversing process, cited the two cases of Thornberry v. Churchill, 4 T. B. Mon. 35, 16 Am. Dec. 125, and Pearson v. Baker, 4 Dana, 321. Counsel for defendant, as justifying the use made of said process by the fourth hypothesis, rely mainly on the two earlier cases of Beckley v. Bryan, Sneed 91, and Bryan v. Beckley, Litt. Sel. Cas. 91, 12 Am. Dec. 276. What deduction, then, is to be made from these four cases?

The historical method requires that we should dispose of the two latter ones first. They involved the location of the same boundary of land. They were two appeals of the same case. The decision in the first case was rendered November, 1801, and that in the second November, 1809, eight years later. The decision in the latter case, however, was not published until 1824, long after decisions subsequently rendered in other cases had been published. It was published then, along with other omitted decisions, pursuant to an act of the Legislature. The boundary whose location was involved in said cases was that of a four-sided body of land, or one consisting of four lines. The calls therefor as they appeared in the certificate of survey

and patent are not given in the report of either case, and it cannot be readily made out from either just how they did so appear. As near as I can make it out, this is how it was: Beginning at a white walnut and hoopwood, and running thence with the line of William Preston S. 45° W. 500 poles, to ——— trees; thence N. 70° W. 600 poles, to ——— trees; thence N. 20° E. 460 poles, to an elm, buckeye, and ash; thence S. 70° E. 800 poles, to the beginning. The trees marking the second and third corners, which were named in the certificate of survey and patent, but which are not named in either report, were nonextant. Those marking the beginning and fourth corners were extant. The first line, from the beginning corner to the second corner was visible; i. e., could be traced on the ground by visible marks, probably marked trees. It was the longer line of the adjoining survey of William Preston. The call for S. 45° W. corresponded with the course of that line as so marked. The call for the fourth line, running from the elm, buckeye, and ash, the fourth corner, to the white walnut and hoopwood at the beginning corner, was, as stated, S. 70° E. 800 poles. Such however, was not the real course or distance of said line. As it really was, it departed from the call as to both course and distance. The departure as to course was perhaps as much as 2½ degrees, and that as to distance 184 poles; the real distance being 984 poles, instead of 800, as called for. The fact as to departure of this line from the call as to course was not known on the first appeal, but was known on the second. It was known on the first appeal that the distance of the fourth line was greater than called for, but it was not known that it was as great as it really was. The course thereof was supposed to be as called for. According to the calls, the second line (which was N. 70° W.) and the fourth line (which was S. 70° E.) were parallel. But, if the fourth line was run as it really was and the second line as called for, the two lines would not be parallel. According to the calls, the second line was 200 poles shorter than the fourth line, and, of course, the second line, located as called for, would have been 384 poles shorter than the fourth line as its length really was. The boundary purported to contain 2,000 acres. In fact, located as it was decided it should be, it contained "much surplus." No importance seems to have been attached on either appeal to the fact that the first line was visibly marked and hence fixed as to course, which fixed also the location of the second corner in so far as direction from the beginning corner was concerned. It seems to have been treated as a case involving the location of three lines intervening between extant corners and two nonextant corners at their points of connection with each other. No connection could be made between the beginning and fourth corners by running said three intervening lines according to the courses and distances called for. The question then was how the connection should be made—on the first appeal, under the facts as they were then understood to be; on the second appeal, under the facts as they really were. On the first appeal it was held that the connection should be made in this way, to wit:

"As to ascertaining Beckley's lost corners and lines, the meaning of the court is, from his northwestwardly·corner, an elm, buckeye, and ash, extend a line S. 20° W. 460 poles. From his eastwardly corner, a white walnut and hoopwood, extend a line southwest, with a line styled in his grant William Preston's, 500 poles. The extremities of these two extended lines will be the lost corners, and then connect these corners with a line running parallel to the line which connects the two first-mentioned corners, and the survey will be closed."

This conclusion was reached after considering generally the subject as to how lines intervening between extant corners of a boundary of land and the nonextant corners at their points of connection with each other should be located and laying down general rules applicable to the different situations or conditions that might exist. Three such general rules were thus laid down, as follows, to wit:

(1) If it is possible to make a connection between the extant corners by locating the intervening lines according to the courses and distances called for, then such lines and nonextant corners should be thus located. The general principle in pursuance to which this rule was laid down was that:

"Nothing but necessity will justify departure either from course or distance."

(2) If it is not possible to make a connection between said extant corners in this way, and it is possible to make it by locating the intervening lines according to courses called for, departing from the calls as to one or more of the distances, then said lines and nonextant corners should be thus located. The general principle in pursuance to which this was laid down was that:

"When a departure from either course or distance becomes necessary, reason as well as law seems to suggest that the distances taken in our mode of mensuration ought to yield, as being much the more uncertain of the two."

(3) If, however, it is not possible to make the connection in either of these two ways, then said intervening lines and nonextant corners should be located by departing from the calls as to both courses and distances the extent necessary to make the connection. The general principle in pursuance to which this rule was laid down is implied in that in pursuance to which the first one was laid down, to wit: Necessity will justify departure from both course and distance.

To the second of these general rules two subrules were laid down. The first one had application where there were three or more intervening lines and two or more nonextant corners; the second, where there were but two intervening lines and a single nonextant corner. The first one was stated in these words:

"But, if the courses and distances thus run do not close the survey, it must be accomplished by running the same courses and either lengthening or shortening the distances, as each case may require, and in proportion to the length of each line as called for in the plat and certificate."

Or again in these words:

"But when two or more corners are missing, and running the distances called for in the plat and certificate of survey will not close, then the length of each line can only be determined by calculation."

The second one was stated in these words:

"When there is but one corner of a survey lost, the courses called for in the plat and certificate of survey ought only to be regarded, and nothing more is necessary than to extend those courses from the adjacent corners, which remain until they intersect each other, and the place of intersection will be the situation of the corner to be ascertained."

Just here, in passing, it should be noted that this subrule afterwards became firmly fixed in Kentucky law. In the case of Haggan v. Wood, Sneed, 273, it was said:

"Conformably with principles formerly established by this court in such cases, a line should be extended north from Rees' said corner so far that a line extended west from the said walnut tree will intersect it, and this intersection should be considered as the place where the lost hoopwood stood."

In the case of Wishart v. Cosby, 1 A. K. Marsh. 383, Judge Owsley said:

"There could not be a doubt, from the repeated decisions of this court, but that the intersection of the lines from the northeast corner and the southwest corner should form the northwestern boundary of Cosby's claim."

In the case of Mercer v. Bate, 4 J. J. Marsh. 339, Judge Robertson said:

"The counsel for the appellant urge the analogy between this case and that of Beckley v. Bryan and Ransdale, reported in printed decisions by Sneed (page 91); and they insist that to find the white oak corner the patent courses should be reversed, and that wherever a line from M. will strike one from D., pursuing the reversed courses in the patent, the law there fixes the corner. The cases are not analogous, and therefore the argument, although it was ingenious and able, is not applicable. If we have not been mistaken in the foregoing view, there is no necessity for resorting to that species of legal construction which the authority of the case in printed decisions and of many subsequent cases prescribes."

To the first one of these two subrules an exception having application to a boundary which had four corners only was laid down in these words:

"It may be supposed that where two corners of a survey are lost which has only four corners, and the distance between the remaining corners is greater or less than the distance called for in the plat and certificate of survey, the three lost lines should be extended on their respective courses so as to bear a just proportion to the remaining line, which would, indeed, be in conformity to the general rule just prescribed; at least, the same effect would be presumed as if the rule had been literally applied. But it is conceived by the court that the remaining line, being ether longer or shorter than is expressed in the plat and certificate of survey, ought to be presumed to have happened by mistake, which could necessarily have affected only the length of the opposite line. Therefore the presumption cannot be carried further, in violation of the lengths of the other two lost lines, than as specified in the plat and certificate of survey, and, therefore, that every such case must be an exception to the rule; that is to say, the two lost lines which are to run from the remaining corners ought to be extended on the courses and to the distances called for in the plat and certificate of survey, making proper allowance on each line for the unevenness of the ground over which it passes, and also to preserve the course of the other lost line as called for in the same. The propriety of the exception will be further evinced by considering that the general rule arises principally from the necessity of the

cases to which it is applied, but in the cases to which the exception is applied the necessity does not exist, and surely nothing but necessity will justify a departure from either course or distance."

Indeed, it would seem that in such a case the connection could not be made by following the courses of all three lines without limiting the change in distance to the line opposite to that in which the mistake of distance was made, and that necessity would require that it be so confined. The case in hand was treated as coming within said exception—i. e., as involving the location of three intervening lines and two nonextant corners of a four-cornered boundary—and hence said lines and corners were located in accordance therewith. The case, however, was not without a feature that might be thought to have warranted its being treated as coming within the second subrule; i. e., as involving the location of two intervening lines and one nonextant corner, to wit, the second and third lines and the third corner. This feature was the visibly marked line of the adjoining survey of William Preston, a part of which constituted the first line and in which the second corner was located. It fixed the course of that line and the direction of that corner from the beginning corner. That line and corner lacked fixity or extantness only in so far as distance from the beginning corner was concerned. That was left to be determined alone by the call, according to which it was 500 poles. If this view of the matter should be correct, the direction given as to how the location should be made, quoted above, amounted practically to a direction that it be made in accordance with said second subrule. It was no more than it would have been had the direction been to begin in Preston's line 500 poles from the beginning corner, and run thence a line parallel with the fourth line until it intersected the third line run the reverse of the course called for. The point of intersection would have been at the distance called for as to the third line had there been no mistake in the course called for as to the fourth line. The language quoted from the opinion of Judge Robertson in Mercer v. Bate would seem to indicate that he so construed that decision.

This analysis so far of the case of Beckley v. Bryan places us in position to estimate its bearing on the question in hand; i. e., when is it proper, in locating the lines of a boundary of land intervening between extant corners and nonextant corners at their points of connection with each other, to run said lines, or some of them, the reverse of the order and of the courses called for. It will be noted that by the location directed to be made in that case the third line was run the reverse of the course called for; that by every other location made according to the exception to the first of said two subrules, in a case coming within it, the third line had to be run the reverse of the course called for in order to make it; and that in every location made according to the second of said two subrules the posterior line, the second of the two intervening lines, had to be run the reverse of the course called for in order to make it. It is possible, if not probable, that in many cases coming within the first of said two subrules, and not within said exception, one or more of the inter-

141 F.—48

vening lines had to be run the reverse of the course called for, and, if more than one, as a matter of course, that those lines had to be run also in reverse order, in order to make a location in accordance with said subrule. This being so, the deposit from the case of Beckley v. Bryan is this: That resort should be had to the reversing process in locating such intervening lines and nonextant corners of a boundary of land whenever it is necessary to resort thereto in order to comply with said second general rule; i. e., to make a location of said intervening lines according to the courses called for, departing from the calls as to one or more of the distances and to the extent that it is necessary to make such a location. That it was felt that such was the precipitation from it is evident from the fact that amongst other premises stated at the beginning of the opinion was this one, to wit:

"That this court cannot discover, from the land law or from the nature of the case, that the corner of a survey which is made the beginning in the plat and certificate of survey is of any higher dignity or of greater importance in any point of view than one of the other corners, nor in this respect that the surveyor was subjected to the direction of the owner; but it rather seems that the surveyor was, and ought to have been, left at discretion to fix on the corner of a survey for a beginning which might afterwards be the most easily found, or which could be described with the greatest certainty, without consulting the owner, or giving a preference to the beginning called for in his entry, when survey was founded on an entry. And, for similar reasons, it seems that it was also at the discretion of the surveyor, when he was inserting the other corners, in the plat and certificate, to proceed either to the right hand or to the left from the corner he chose to name first."

The raison d'être of this premise must have been an anticipated objection to the second general rule, about to be laid down, that it involved a resort to a greater or less extent to the reversing process in order to make a location in accordance with it.

One other matter remains to be noticed in order to a complete appraisement of this case. As heretofore stated, the boundary of land involved therein was said to contain 2,000 acres; but, located as it was decided it should be, it contained "much surplus." That there was nothing in this consideration to affect the propriety of the location made, this other premise was laid down, to wit:

"There is but one species of cases in which any court of justice is authorized by our land law to divest the owner of a survey of the surplus included within its boundaries, namely, where the survey was made posterior to an entry made by another person on the same land, and to do more would be unequal and unjust, inasmuch as a survey which is too small cannot be enlarged."

Now, then, as to the decision on the second appeal in Bryan v. Beckley. The only question involved in that appeal, over and above what was involved in the first one, was as to the effect, if any, that should be given to the consideration that the real course of the fourth line was not as called for, and the excess of the real distance thereof over that called for was greater than it was understood to be on the first appeal. Of course, there was nothing in the greater excess of distance to cause a location different in any particular from that which was held to be the proper one in the first appeal. How as to the

variation of the real course from that called for? The existence of this variation prevented a connection of the ends of the first and third lines, run, the first the course and distance called for, and the third the reverse of the course and the distance called for, by a line run the course called for. It is probable that the ends of these two lines thus run could have been connected by a line run the real course of the fourth line—i. e., parallel to its real course—thus imparting to the second line the mistake in course as to the fourth line as well as to the mistake in distance. In order to connect the first and third lines by a line run according to the course called for, it was necessary to either lengthen the third line or shorten the first one. The connection could be made in either way and thus bring about a location of all three lines according to the courses called for. There were thus two ways of so locating said three lines. The problem before the court, therefore, was as to whether the mistake as to course in the fourth line should be imparted to the second line, and it run the real course of the fourth line, and hence parallel to it; and, if not, which of said two alternative ways of locating said three lines according to the courses called for should be adopted. Its freedom of action in solving was limited by the decision on the former appeal. It was bound by the rules laid down and principles recognized on the former appeal, so far as they applied to the case under its changed aspect. Chief Justice Bibb stated this in these words:

"It is distinctly to be understood that we feel ourselves bound to adhere to the principles of the former decision, as well because we are fully persuaded that they are correct in themselves, as because, if they were not orthodox, we have no lawful power to change or oppugn their application to this controversy. So far as they apply, we disclaim all and every authority to counteract them by any other. If the case, in its new features, can be adjusted according to the principles of the former decision taken in their true spirit and effect, then assuredly it must be so decided. Where those principles fall short, others apposite and coadjutant may be applied."

Amongst the other rules laid down on the first appeal which it thus felt itself bound by was the second general rule, which required that the lines of a boundary of land intervening between extant corners and the nonextant corner or corners at their points of connection with each other should be located by running those lines the courses called for, if the location could thus be made, and could not be made by running them the courses and distances called for. It regarded that this rule as thus laid down required that in every instance where said intervening lines and nonextant corner or corners could thus be located and could not be located in the other way, they should be so located, and that there was no exception whatever to it. The only thing which it considered would authorize a departure from it was "inevitable necessity"; and, whilst "inevitable necessity" is not defined, I take it that by it was meant an impossibility of locating said lines in accordance with said rule. If this is so, then "inevitable necessity" was not an exception to the rule, but a limitation upon it. With this view of the matter, of course, the court was bound to hold that the lines and corners whose location was involved therein should not be located in the first of the three ways suggested above; i. e.,

by imparting the mistake as to course in the fourth line to the second line, and running it, not the course called for, but the real course of the fourth line, and hence parallel to it. For "inevitable necessity" did not, as the court looked at it, require that the course called for as to the second line should be disregarded. It could be located according to the course called for in either one of the two other ways of making the location suggested above. Judge Bibb said:

"If any intention of departing from course, except from inevitable necessity, had been intended, the direction to connect the extremities of the two lines, the one of 500 poles and the other of 460 poles, would have been nugatory; for a line run from those extremities to connect them would have closed the survey. But so to connect the lines did not comport with the views and intention of the court. Such a connection might have, and in fact would have, produced a departure from the patent course expressed for that line."

There was, therefore, nothing left to be done but to choose between said two other ways of making the location. The court held that the location should be made by shortening the first line. The ground upon which it so held was that this way was against the claimant of the land. Judge Bibb said:

"The length of one or the other of the lines of 500 poles or of 460 poles— that is to say, of A, B, or E, C—must be departed from, and then the length of the one which is made to yield must be determined by calculation. We say the one or the other, because there is no necessity for both to yield, and to make them both do so would be a departure from the spirit of the first and fifth principles, and to the second case put, in the section just alluded to. A departure from distance, even, ought not to be indulged farther than necessary. A departure in the distance of both lines is not necessary. Either lengthening the line of 460 poles, or shortening that of 500 poles, will do; and the section directs a lengthening or shortening, but not to do both, unless upon necessity. The former opinion excludes the idea of deciding the matter by going around from the beginning called for in the grant, in the progressive order of the courses and distances therein recited, because, by the fourth section of the opinion, it is clearly to be understood that the order of the courses in the certificate of survey is no evidence that the same order was observed in executing the survey. But there is a principle of equity which seems to be decisive on this subject, namely, that a complainant in equity ought not to have relief farther than his claim is reasonably certain. Now it is evident that if from the extremity of the line of 400 poles (from C) a line is extended the patent course to intersect the line of 500 poles (A, B, shortened), and from the extremity (B) of the line of 500 poles a line be extended the patent course to intersect the line of 400 poles (E, C) extended, the claim to all the land between those two lines is in dubio; that land may have been excluded or included by the grant. And this argument would apply also to the extension and diminution of the distances on the lines E, C, and A, B, in equal proportions. But as to all the lands which would be included by retaining the line of 460 poles in length, and reducing the line of 500 poles by calculation to close the survey, the grant would be certain in every part, and for that only the claim should be established."

In so holding a portion of the visibly marked line of Preston called for as constituting the first line was thrown out of the boundary. That line, notwithstanding the advantage it had over the third line, in that it was marked upon the ground, coinciding as marked with the call for course, was treated as of no greater value than said third line. The decision in the second appeal, therefore, makes no advance over that in the first as to the contingency in which resort

should be had to the reversing process in locating such intervening lines and nonextant corners of a boundary of land. It simply recognizes the same contingency as that which was the outgrowth of the decision on the first appeal. It, however, makes a greater use of the reversing process. The decision on the first appeal required only that the third line should be run the reverse of the course called for; that on the second, that the second and third lines should be run in reverse order, and each the reverse of the course called for.

The advance which Bryan v. Beckley made upon Beckley v. Bryan was in its interpretation of the second general rule laid down in the latter case and its determination as to which of the two alternative ways of making a location according to said rule should be chosen. It held generally that said rule required that no departure should be made from it save in the case of "inevitable necessity," and particu-. larly that in case of a boundary of a four-sided body of land a mistake in the call for course of the line connecting the two extant corners thereof was not sufficient ground for departing from the call as to course for the opposite line connecting the other two corners which were nonextant, though mistake in distance was sufficient ground for departure from distance. As to choosing between the two alternative ways of making a location according to said rule, it held that way should be chosen which was most against the claimant, even though the effect of such choice was to throw out a portion of a visibly marked line in the boundary of said land.

Now, then, as to the two cases cited by Judge Hobson in Creech v. Johnson: Neither one of these two cases makes any advance upon Beckley v. Bryan as to the contingency in which resort should be had to the reversing process in locating such intervening lines and nonextant corners of a boundary of land. They each make use of the reversing process in the same contingency in which it was used in said case, to wit, to make a location of said lines according to the courses called for; it not being possible to make the location according to both courses and distances called for.

The case of Thornberry v. Churchill was another instance to those already referred to of an application of the second subrule to said second general rule laid down in Beckley v. Bryan. It involved the location of a portion of a boundary of a four-sided body of land, the same as in Beckley v. Bryan and Bryan v. Beckley. The boundary was as follows, to wit:

"Beginning at a poplar and beech, corner to William Fleming and Henry Harrison; and with Harrison's line N. 80° E. 80 poles, to a beech in William Bryant's line; with the same south 228 poles, to a beech in William Pope's line; and with the same west 297 poles, to a white oak and poplar in Fleming's line; and with the same N. 45° E. 300 poles, to the beginning."

There was but a single corner nonextant. The beginning, second, and fourth corners were extant. There were some variations between the calls for the second and fourth corners and the facts; but they were not regarded as rendering the corners nonextant. This, of course, fixed the location of the first and fourth lines. According to the calls, the third corner, a beech, was at the junction of the west

line of the adjoining survey of Bryant and of the north line of the adjoining survey of Pope. It was nonextant, because the beech could not be found and there was no junction of said two lines of said two adjoining surveys. This was because the Bryant survey was east and north of the Pope survey, or the Pope survey was south and west of the Bryant survey. Hence it was, as stated, a case within the first subrule to the second general rule stated in Beckley v. Bryan. That rule required that the second line should be run south from the second corner with Bryant's line as far as it went, and the third line should be run east the reverse of the course called for from the fourth corner with Pope's line as far as it went, and that the two lines should be extended until they intersected. It was in justification of the use of the reversing process in making such a location of the intervening lines and nonextant corner in such a case that Judge Bibb, then Chief Justice, said:

"The order in which the surveyor gave the lines and corners in his certificate of survey is of no importance. To find the position of the survey by reversing the courses is as lawful and persuasive as by following the order in the certificate of survey. The cases adjudged upon that point are conformable to reason and practical utility in guarding against mistakes and destruction of corners by fraud, accident, and the elements."

In fact, owing to the fixity of the west line of Bryant's survey and of the north line of Pope's survey, it was impossible to fully locate the lines and corners in question in said case in any other way than was adopted.

The case of Pearson v. Baker was like Bryan v. Beckley, in that it was possible to make two locations of the intervening lines and nonextant corners according to the courses called for as to said lines, departing from the distances to a certain extent, which were treated at the only alternative locations thereof; and it was held, as in that case, that that location should be adopted which was against the claimant. It involved the location of four intervening lines and three nonextant corners of a boundary of a ten-sided body of land, and hence came within the first subrule to the second general rule laid down in Beckley v. Bryan, but not within the exception thereto. The departure from distance, however, was not distributed proportionately amongst said four lines, as seems to be required by said first subrule. Indeed, I do not see how it was possible to so distribute and yet comply with said second general rule. It was confined to one of said four lines. The extant corners were the first, second, third, fourth, and fifth, at the beginning, and the ninth and tenth, at the end. The nonextant corners were the sixth, seventh, and eighth, and the portion of the boundary whose location was involved was, therefore, the fifth, sixth, seventh, and eighth lines, and the sixth, seventh, and eighth corners. One of the two alternative locations thereof referred to above is referred to by Judge Ewing in these words:

"By extending the line from the fifth corner, which is found, towards the sixth, the distance called for in the patent, preserving the course of it and the subsequent lines, the survey would close; but the opposite line or lines from the seventh to the eighth and from the eighth to the ninth corners

would be longer than the distances called for in the patent by some 50 or 60 poles each."

The other is referred to by him in these words:

"If those lines are reversed, and the distances called for in the patent run, preserving the courses called for, the opposite line or lines from the fifth towards the sixth corner will be contracted some 60 or 70 poles short of the distance called for."

He stated the question in the case in these words:

"And the only question is whether the line from the fifth to the sixth corner shall be extended the full distance called for, which, by preserving the courses, would make the opposite lines longer than called for; or whether those lines should be contracted to the true distance called for by reversing the courses, which would contract the line from the fifth towards the sixth corner some 60 or 70 poles shorter than called for."

The second of these two alternative locations, on its face, involved a resort to the reversing process in order to make it. According to it, the four lines would be run in reverse order, and each one the reverse of the course called for. Apparently, at least, the first one did not involve a resort thereto. But, as far as I can make it out, it would seem that it did, though not to so great an extent as the second one. It involved that the eighth line should be run the reverse of the course called for until it intersected the seventh line run, together with the fifth and sixth, the course called for; the latter two the distance called for, also. I do not see how the courses of all four lines under this location could otherwise be preserved. It was held that the second of these two locations should be made. This was on the ground that it was against the claimant of the boundary. There was, however, another circumstance that might be thought to have favored the location. It was that, according to it, the distances of all the lines were preserved save as to one, the sixth; whereas, according to the other, the distances of two of the lines, the seventh and eighth, were not preserved.

In estimating the value of this decision it should be noted that it was emphasized by Judge Ewing that there was an entire absence of any circumstance other than the one which controlled the decision to affect the choice between the two locations. This he did in these words:

"The quantity embraced in the survey by adopting either of these modes of construction is not given; nor does it appear whether there will be a surplus, the true quantity or a failure of quantity, by adopting one mode or the other; nor are the true distances or courses of the opposite lines which are found given; nor is there any other circumstance which might produce a preponderance of presumption in favor of one mode of construction or the other. In this naked attitude of the case, we are called upon to determine which mode of construction shall be adopted to find the true position of the lost corners."

The principles which he regarded as applicable to the cases, limiting the choice of location to the two stated and determining the choice between them, were stated in these words:

"First. In general, distance yields to course, or, in the absence of any circumstance bringing the mind to a contrary conclusion, the courses shall be

first pursued, contracting or extending the distances, as the case may require, to make the survey close.    Litt. Sel. Cas. 91 [12 Am. Dec. 276].

"Second. The beginning corner in the plat or certificate of survey is of no higher dignity or importance than any other corner of the survey.  Beckley v. Bryan, Sneed, 91.

"Third. The order in which the surveyor gives the lines and corners in his certificate of survey is of no importance to find the true position of the survey.  Reversing the courses is as lawful and persuasive as following the order of the certificate.  [Thornberry v. Churchill] 4 T. B. Mon. 32.

"Fourth. That construction is to prevail which is most against the party claiming under an uncertain survey.  It is his duty to show and establish his corner.  Preston's Heirs v. Bowmar, 2 Bibb, 493.  From which it will follow that he who sets up and relies on an outstanding claim must show that it embraces the land in contest, and should not succeed by using it when it is uncertain whether it embraces it or not."

The conclusion reached in view of these general principles was stated in these words:

"In the absence of all circumstances to lead the mind to any definite conclusion, we cannot determine whether the surveyor made the mistake by running the sixth [fifth?] line too short, or the eighth or ninth [seventh or eighth?] too long, and we are not warranted in coming to a conclusion that the mistake occurred in the eighth or ninth [seventh or eighth?], by running them too long, rather than in the sixth [fifth?], by running it too short, because it approximated nearer to the beginning than the other two in the order in which the certificate of survey has been made out.  In this uncertainty as to the line or lines in which the mistake occurred, or as to the true position of the lost corner, the defendant who sets up and relies on the claim as embracing the land in controversy cannot succeed."

These four cases, the two relied on by defendant's counsel and the two cited by Judge Hobson in Creech v. Johnson, present us, therefore, with a single contingency for resorting to the reversing process in locating lines intervening between extant corners of a boundary of land and the nonextant corners at their points of connection with each other.  That contingency is whenever it is proper, if not whenever it is possible, to locate said lines according to the courses called for, and it is not possible to make such location without resorting to such process.  This contingency is distinct from that presented to us by the North Carolina decisions and those of other jurisdictions following in their wake.  The contingency thereby presented, as will be borne in mind, is whenever the posterior line has an advantage in point of certainty over the prior line.  The latter contingency is the existence of a certain fact; the former, the possibility, if not the propriety, of accomplishing a certain fact, and the impossibility of accomplishing it without resort to the reversing process.  The one contingency involves a greater resort to the reversing process than the other.  The one involves the application of such process to at least two lines, and hence the running of lines in reverse order, as well as the reverse of the courses called for.  The other, whilst it may involve this much, may not involve more than the application of such process to a single line and the running of it the reverse of the course called for; i. e., it involves so much resorting to the reversing process as is essential to locating said lines according to the courses called for, and no more.  I find no case in Kentucky recognizing the contingency presented by the North Carolina de-

cisions. There would seem to be. no doubt, however, but that in a case involving it the Kentucky Court of Appeals would recognize it as calling for a resort to the reversing process. It seems to be in accordance with right reason. But, on the other hand, it would seem that the North Carolina Supreme Court does not recognize the contingency presented by these Kentucky decisions, at least so far as a case coming within the second subrule to the second general rule laid down in Beckley v. Bryan is concerned. The case of Harry v. Graham was such a case, and one, according to the Kentucky decisions, calling for the application of said subrule. It involved the location of two intervening lines and a single nonextant corner. Said subrule was not applied thereto by the Supreme Court of North Carolina, but it made a location of said lines contrary thereto.

Returning, then, to the contingency thus presented by these four cases, it is important to the determination of the question whether this case comes within it that we should understand exactly the nature of it. As I have stated it above, it is whenever it is proper, if not whenever it is possible, to locate the intervening lines according to the courses called for, departing from the distance, and it is impossible to make such location without resorting to said process. Is it, then, whenever it is possible to make such location, or simply whenever it is proper to do so? Is the true deduction from those four cases that, in every case where it is possible to locate such intervening lines according to the courses called for, they should be so located, so that the contingency calling for resort to such process are the two facts, to wit, the possibility of making such location and the impossibility of making it without resorting thereto? Or is the true deduction therefrom that, in every case where it is proper to locate such intervening lines according to the courses called for, they should be so located, so that the contingencies calling for resort to such process are the two facts, to wit, the propriety of making such location and the impossibility of making it without resort thereto? In Beckley v. Bryan it is laid down in general terms that said lines should be located according to courses called for whenever they cannot be located according to courses and distances called for both, but can be located according to courses called for alone. No exception is stated, and apparently the only limit to the requirement is the impossibility of doing the one thing and the possibility of doing the other. In Bryan v. Beckley seemingly the requirement is so interpreted. It is stated that said lines should be so located unless "inevitable necessity" requires otherwise, which I take to mean, as heretofore stated, unless it is impossible so to do. In Thornberry v. Churchill nothing whatever is said on this subject. But when we come. to Pearson v. Baker we find the rule laid down in Beckley ·v. Bryan, as interpreted in Bryan v. Beckley, toned down somewhat. It is there said, in stating the general principles applicable to the case, as quoted above, that "in the general" distance yields to course, or "in the absence of any circumstance bringing the mind to a contrary conclusion the courses shall be first pursued, contracting or extending the distances as the case may require to make the survey

close." According to this, a location according to courses called for is to be made "in the general," or "in the absence of any circumstances bringing the mind to a contrary conclusion." Brvan v. Beckley is cited as supporting this statement. It is evident, however, that Bryan v. Beckley is no authority for such cautious statement. It is equally evident that the source of it is the case of Preston v. Bowmar, 2 Bibb, 493, cited by Judge Ewing in support of the fourth general principle stated by him, and to which reference is made in the former opinion. It is there analyzed to a certain extent, but it is important that in connection with the matter in hand it should be gone into deeper. The boundary therein involved, like that in Beckley v. Bryan and Bryan v. Beckley, was that of a four-sided body of land. It is as follows, to wit:

"Beginning at an ash in the middle of a line of Glenn's land; and with it N. 20° E. 800 poles, crossing three branches, to a hoopwood and sugar tree, corner to Moffit's land; and with a line thereof N. 70° W. 100 poles, crossing the creek, to a sugar tree; S. 33° W. 820 poles, crossing three forks of the creek, to two sugar trees; S. 70° E. 300 poles, to the beginning."

The beginning corner, the ash, and the second corner, the hoopwood and sugar tree, were extant. This fixed absolutely the first line. The third corner, the sugar tree in Moffit's line, 100 poles from the second corner, was nonextant, otherwise than as fixed as to direction from the second corner by Moffit's line. The fourth corner, the two sugar trees, was entirely nonextant. The first line was not according to course called for. It varied several degrees north from the call, and was 963 poles long, or 163 poles longer than the call. The course of Moffit's line, which was visibly marked, varied something from the call. So far, at least, how like the facts in the case of Bryan v. Beckley were the facts of this case? If we treat the ash, elm, and buckeye corner—the fourth corner—of the boundary involved in that case as the beginning corner, we have exactly the facts of this case with one exception. The beginning and second corners would be extant there the same as here. This would fix absolutely the first line, and there, as here, it would vary something from the call as to course and distance both. Again, there, as here, the second line would be a portion of a visibly marked line of an adjoining survey, there of Preston, here of Moffit; the third corner would be nonextant, save so far as direction from the second corner was concerned; the fourth corner would be entirely nonextant; and the lines to be located would be the third and fourth, or, if the third corner be treated as entirely nonextant, the second, third, and fourth. The only difference between the two cases would be that in Bryan v. Beckley the visibly marked line of Preston, called for as the second line under the hypothetical case stated, would be the same as the course called for, whereas here the visibly marked line of Moffit, called for as the second line, varied something from the call as to course. There was nothing in the mere circumstance that in Bryan v. Beckley it was the beginning and fourth corners that were extant and the first line that was part of a visibly marked line of an adjoining survey, whereas in Preston v. Bowmar it was the beginning and second cor-

ners that were extant and it was the second line that was a part of a visibly marked line of an adjoining survey, or in the further circumstance that in Beckley v. Bryan the visibly marked line, a part of which constituted the first line, corresponded exactly with the call as to course for that line, where as in Preston v. Bowmar the visibly marked line, part of which constituted the second line, varied something from the call as to course for that line, to cause a difference in the decisions of the two cases. Yet how different in fact was the decision? According to the position taken in Beckley v. Bryan that no departure should be made from the courses of the intervening lines whose location is in question except in case of "inevitable necessity" and according to the location therein made of the intervening lines whose location was involved therein, to wit, the second and third, no departure should have been made from the courses of the intervening lines whose location was involved in Preston v. Bowmar, to wit, the third and fourth, because "inevitable necessity" did not require it. This position limited the choice of two alternative locations of said lines, each one of which was a location according to course called for. One was to run the third line the course called for and the fourth line the reverse of the course called for, and extend the two lines until they intersected. The other was to run the third and fourth lines in reverse order, and each one of them the reverse of the courses called for. The former preserved the entire 100 poles of Moffit's line, constituting the second line; and the latter threw out 81½ poles thereof. And according to the further position taken in Bryan v. Beckley the latter of these two alternative locations should have been chosen, because it was against the claimant. But the alternative locations contemplated by the court in Preston v. Bowmar were not these two. The latter one of the two, the one which was in accordance with the location in Bryan v. Beckley, was not contemplated as a possible location. The only two locations contemplated were the former one of these two and a location made which, like it, accepted the second line as 100 poles long with Moffit's line from the second corner, and ran the fourth line the reverse of the course called for, but according to the distance called for, and then connected the ends of these two lines thus run by the third line. This location was in accordance with the location which was discarded in Bryan v. Beckley as foreclosed by the decision in Beckley v. Bryan, and it located the third line not according to the course called for, but departing therefrom, and in disregard of the rule laid down in Beckley v. Bryan, as interpreted in Bryan v. Beckley, that no departure should be made from course called for save in the event of "inevitable necessity." It was held that such was the proper location to be made of the lines in question. It is true, as suggested by defendant's counsel, that amongst the reasons given for the choice of this location in preference to the other one with which it was contrasted was that of the two it was against the claimant—the same reason given for the choice made in Bryan v. Beckley between the two alternative locations in accordance with the courses called for. Chief Justice Boyle expressed himself to this effect in these words:

"We ought, upon the clearest principles of reason, as well as law, to prefer that which operates against those claiming under the survey."

And again in these words:

"And a title founded upon a doubtful hypothesis ought not to succeed against the possession alone, where the party claiming under the doubtful title is plaintiff; nor ought it to succeed against a clear title in another, whether the party claiming under it is plaintiff or defendant, or whether the controversy is before a court of law or equity. For in no court, nor in no situation, ought a doubtful title to prevail against a clear one."

But the location which was in accordance with that made in Bryan v. Beckley—i. e., which ran the third and fourth lines in reverse order and the reverse of the courses called for, throwing out a portion of Moffit's visibly marked line called for—was still more against the claimant, and yet this fact was not deemed sufficient even to bring that hypothetical location up for consideration. This circumstance, then, could have been regarded only as one confirming a location already determined on because of other circumstances. What, then, were the circumstances which led the court to adopt a location which involved a departure from the course called for as to the third line? There were two of them. One was the existence of the mistake in the call for the opposite line, to wit, the first one, as to course. Judge Boyle referred to this in these words:

"There are, however, circumstances in this case upon which we think the presumption of a mistake in the course of the line opposite to the one connecting the two corners extant ought to be preferred to the presumption of a mistake in the distance of the two others. The necessity of presuming a mistake in either is obviously produced in a great measure by the mistake which is found to exist in the courses of the lines extant. As, therefore, when the necessity of presuming a mistake of distance in some or of course in others of the lost lines is produced by the mistake which is found in the length of the lines extant, we adopt the presumption of a mistake in distance, rather than in course, so by a parity of reason, when the same necessity is produced by the existence of a mistake in the course of the lines extant, it would seem proper to presume a mistake in the course, rather than in the distance, of the lost lines. In this way the necessity of presuming a mistake of either course or distance will be made to operate according to the cause which produced it."

The other circumstance was referred to in these words:

"The presumption of a mistake in the course of one line, rather than of distance in the others, is in this case in no inconsiderable degree fortified by the consideration that the figure of the survey will thus be preserved as nearly as the course and distance of the line extant will permit, whereas, if the survey should be made to close by presuming a mistake in the distance of the others, the figure will in a great measure be destroyed."

This case of Preston v. Bowmar was decided in the fall of 1811, about two years after the decision in Bryan v. Beckley. The decision in it was printed in 1816, long before that in Bryan v. Beckley was printed, as heretofore stated. It must be admitted that it qualifies, if it does not directly conflict, with Bryan v. Beckley, and in so far as it affects the decision in that case, being the later of the two and published in due course, must be accepted as controlling. It certainly qualifies the broad statement in Bryan v. Beckley that no departure can be made from course, save in case of "inevitable necessity," and justifies the cautious statement of Judge Ewing in Pres-

ton v. Bowmar that departure should be made from course when there is "any circumstance bringing the mind to a contrary conclusion." And it would seem to overthrow the position taken in Bryan v. Beckley that the mistake in the fourth line as to course should not be imparted to the second or opposite line. Here the mistake in the course of the first line was imparted to the third or opposite line. No express reference is made in Judge Boyle's opinion to the case of Bryan v. Beckley; but there are reasons for believing that he must have had it in mind and been conscious of the fact that position was being taken in conflict therewith. He was on the bench when Bryan v. Beckley was decided, and no doubt participated in the decision. In the short space of time that had elapsed between the two decisions— about two years—and the comparative meagerness of litigation in those days, he can hardly have forgotten it. The change in position taken can be accounted for by the change in the composition of the court which had taken place in the meantime. When Bryan v. Beckley was decided, Judge Bibb, who delivered the opinion, was Chief Justice, and with him were associated Judges Boyle and Wallace. When Preston v. Bowmar was decided, Judge Bibb had left the bench, Judge Boyle had become Chief Justice, and with him were associated Judges Wallace, Logan, and Clarke. I can imagine that possibly Judges Bibb and Boyle did not agree as to the decision in Bryan v. Beckley. If so, it was a case of Greek meet Greek. And though Judge Bibb overcame in Bryan v. Beckley, with him absent, Judge Boyle had his way in Preston v. Bowmar. Judge Boyle's opinion was published in due course, through the instrumentality of Judge Bibb, then reporter, whereas that of Judge Bibb in Bryan v. Beckley remained in oblivion until rescued therefrom along with the many other unreported decisions contained in Littell's Selected Cases. That the question in Preston v. Bowmar provoked much contest is shown by the fact that the defeated plaintiff at once took his case to the United States Circuit Court for the District of Kentucky, the judgment in the state court, a judgment in ejectment, not being an estoppel, from whence it was carried to the Supreme Court of the United States and is the case of Preston v. Bowmar, 6 Wheat. 581, 5 L. Ed. 336, relied on by defendant's counsel on another point. That court followed the Kentucky decision, because the construction which had been made could not be "pronounced unreasonable or founded in clear mistake." Just here, in passing, it should be noted that Mr. Justice Story, in his opinion in that case, referred to the matter of preference between courses and distances called for in these words:

"It may be laid down as a universal rule that course and distance yield to natural and ascertained objects. But where these are wanting, and the course and distance cannot be reconciled, there is no universal rule that obliges us to prefer the one to the other. Cases may exist in which the one or the other may be preferred upon a minute examination of all the circumstances."

The fact that no reference was made by Judge Boyle in Preston v. Bowmar to the decision in Bryan v. Beckley was evidently because it

had not been reported. That he passed it over in silence may be some evidence also of his disapproval of it. But he did refer to the decision in Beckley v. Bryan, and that, too, in a way that indicates that he was conscious of the subsequent decision in Bryan v. Beckley. And the fact that he found it necessary to explain the decision in Beckley v. Bryan, so as to show that the decision in Preston v. Bowmar did not conflict therewith, and the explanation thereof which he gave, are indicative somewhat, at least, that he felt that he was running counter to the decision in Bryan v. Beckley. The explanation of the decision in Beckley v. Bryan is in these words:

"But it was contended in the argument that the case Beckley v. Bryan and Ransdal established the point that a lost line was in no case to depart from its course. We are by no means disposed to derogate from the authority of that case as a precedent. It was the first, and must always remain a leading, one in this country upon the subject of the mode of ascertaining lost lines and corners. The opinion then delivered contains, indeed, a most admirable outline of the general doctrines upon this point; but some of its expressions, when taken in the abstract, and unconnected with context and the case before the court, are certainly liable to be misapprehended, and the expressions principally relied on by the counsel to establish their position seem to be of this description. To understand those expressions correctly, it is proper to have reference to the case as it appeared to the court. In that case a base line was found connecting two corners, which were extant, and another line extending from one of those corners, which was a line of a larger adjoining survey, but upon which no corner was found. The base line was longer than the corresponding line of the patent; but it was not supposed by the court, as is evident from the whole context of their opinion, to vary from its proper course. To make the survey close, therefore, the line opposite to the base line must be extended beyond its given length, or the other lost line must vary from its course. The court decided that the line opposite to the base line should be extended. Acting, as the court did, under the idea that there was no mistake in the course of the base line, the decision was most indubitably correct; and, considered with reference to such case, the expressions in the opinion there delivered, which were relied on in this case, are perfectly consistent with the doctrine we have attempted to establish. But, if those expressions are correctly interpreted in the latitude contended for, then it is evident that the rule laid down in that opinion is broader and more extensive than the state of fact in the case required, and that it ought not to operate upon a case like the present, which, from the circumstance of a mistake in the courses of the lines extant, is essentially different. In that case it was necessary that distance should yield to course, for the purpose of preserving the shape of the figure of the survey, and in this case it is necessary, for the same reason, that course should yield to distance. The same principle, therefore, which required the rule to be applied to the former, prohibits its application to the latter, case."

This explanation, it seems to me, was intended so to limit the decision in Beckley v. Bryan as to prevent its being carried to the extent to which it was carried in Bryan v. Beckley. Concerning this explanation Judge Robertson used these words in Mercer v. Bate, supra, to wit:

"This case (Preston v. Bowmar) reviews that of Beckley v. Bryan et al., and applies its doctrines rationally, according to their principles."

It must be accepted, therefore, that the decision in Preston v. Bowmar is the source of the cautious statement of Judge Ewing in Pearson v. Baker already quoted, and, still further, that case must be

accepted as an authority for the proposition that in case of a boundary of four lines, two corners of which connected by one line are extant, a mistake in the call for course of such line and the necessity of preserving the figure of the original plat of the survey are sufficient considerations or circumstances to justify a departure from the call as to course of the opposite line. In this it is supported, to a certain extent, at least, by the decision in Mercer v. Bate. That case involved a boundary of four lines. The first, second, and third corners were extant. These corners fixed the first and second lines. There seems to have been no mistake in the call for either of the lines as to course. The fourth corner was nonextant, and the case, therefore, involved the location of the third and fourth lines. There were two alternative methods of making their location. One was to locate them as to courses called for, departing from distance. This would be to extend the third line 456 poles. The other was to locate the third line according to course. called for, but 30 poles longer than distance called for, and the fourth line so as to connect the end of said third line thus located and the beginning corner, departing from the call as to course. There were circumstances which pointed to the end of the third line thus located as the third corner, and as to the excess of distance over the call Judge Robertson said it was as great "as the difference between the actual distance of either of the other marked lines and their patent length authorize us to expect." It was held that the latter was the true location. The absence of a mistake as to course in the line connecting the extant corners to affect the matter was referred to by Judge Robertson in these words:

"There was a mistake either in the patent course of the closing line or in the distance called for in the third line and in the plat of the survey. If the competition were between course and distance alone, the course should yield to the distance, because the conflict between them is not produced by a mistake in the course of any other line. See Preston v. Bowmar, 2 Bibb, 494."

The existence of a circumstance in the figure of the survey to affect the matter was referred to by him in these words:

"By establishing X (the corner decided against) as the corner, a figure will be given to the survey obviously and essentially variant from that exhibited in the plat of the original survey. The two plats are strikingly dissimilar. It is scarcely possible that in a survey with only four corners, and the lines of which were all, except one, actually run and marked, so great a mistake could have occurred as that which must be imputed to the surveyor if the white oak corner be at or near X. The official acts of the surveyor are to be accepted. The court must presume that he did his duty and that his report is accurate, the more especially as there is nothing which can tend to even a suspicion that there was any mistake or fraud. The original plat is not only admissible as evidence, but it is essentially one of the most potent facts which can be adduced, and hence it has often been admitted by this court as always either preponderating or alone conclusive."

The significance of the original plat of a boundary of land as a factor in determining its location was referred to by him again in response to a petition for rehearing in these words:

"That the shape of the original survey is evidence and persuasive evidence of the boundary of the original has been too long and too firmly settled by this

court to render it proper now to reason on it or array authorities in its support."

It was referred to by Judge Mills in Alexander v. Lively, 5 T. B. Mon. 159, 17 Am. Dec. 50, in these words:

"The plat is a necessary part of the surveyor's report required by law, and is therefore proper evidence in ascertaining the position of the land, and what is included and must settle the figure in this case and prove the mistake. This accords with many other decisions of this court in construing the acts of ministerial officers, 'ut res magis valeat quam pereat.' "

A recent case making use of the plat of a boundary of land in fixing its location is that of Patrick v. Spradlin (Ky.) 42 S. W. 919. In the case of Blight v. Atwell, 4 J. J. Marsh. 279, the necessity of conforming to the figure of the plat was held to be a sufficient circumstance in and of itself to overcome a course location. The boundary involved in that case was one of four lines. It was as follows, to wit:

"Beginning 864 poles from the river Ohio, adjoining the lands of Philip Barbour, and running S. 72° E. 4,599 poles, to the northern boundary at B, as marked on a certain plan annexed; thence N. 18° E. 864 poles, to a black oak, sugar tree, and ash, on the bank of the Ohio river; thence, down the river and binding thereon, 5,290 poles, to a beech and two sugar trees; thence S. 18° W. to the first bound in the said plan at A."

It was not so stated, but it would seem that the third corner, the black oak, sugar tree, and ash, and the fourth corner, the beech and two sugar trees, were extant. The third line connected these two corners. The first and second corners away from the river were nonextant and it seems that the first, second, and fourth lines were unmarked in any way. The beginning corner according to the boundary, therefore, was S. 18° W. 864 poles from the fourth corner. Running from the beginning corner thus fixed, the course and distance called for would bring one to a point not 864 poles from the third corner, but one much nearer than 864 poles. If the reversing process were adopted, by running the first and second lines in reverse order and the reverse of the courses called for the distance called for, the beginning corner from the river would be located at a point from the river much farther than 864 poles. Here, then, were two alternative course locations. By one the second line would be shortened, and by the other the fourth line would be lengthened. It was held that neither location was proper, and that a noncourse location of the first line, by running the fourth line from the fourth corner the course and distance called for, the second line from the third corner the reverse of the course and the distance called for, and connecting the ends of said lines, which would throw the first line between the two alternative course locations, was the proper location thereof. And it was so held solely because it made the figure of the boundary conform to the figure thereof given in the plat. Judge Robertson said:

"Either the distance or course must, therefore, yield. The circuit court instructed the jury that, in absence of marked lines and corners, the described course must govern and designate the position of B. We do not concur with the circuit court. The plat annexed to the deed for identifying the boundary,

and the calls in the deed, show that the parties intended that A and B should be 864 poles from the river, and that distance instead of marks should identify the corners, and that A and B are both 864 poles from the river, as they are exhibited in the plat. As there is no corner at A, nor line from A to the river, it would be as reasonable to establish B 864 poles from the Ohio, and then reverse the course for the purpose of designating A, as it would be to fix A at the described distance and ascertain B by the course alone. We consider it very clear that B, as shown on the plat, viz., at 864 poles from the river, is the true position for the corner. Many considerations might be suggested which could leave little or no doubt; but argument is deemed unnecessary. A statement of the facts alone should be perfectly satisfactory. The simple fact that the deed is made according to the plat ought alone to be sufficient."

The conclusion to be reached, therefore, is that, notwithstanding what was said in Beckley v. Bryan and what was said and done in Bryan v. Beckley, there is not in this state any hard and fast rule requiring the intervening lines of a boundary of land and the nonextant corners at their points of connection with each other to be located by locating the lines according to the courses called for, if it is at all possible to do so. The rule is that they should be so located unless there is some "circumstance bringing the mind to a contrary conclusion." So it is, as said by Mr. Justice Story in Preston v. Bowmar:

"Cases may exist in which the one or the other (i. e., course or distance) may be preferred upon a minute examination of all the circumstances."

So far as Beckley v. Bryan and Bryan v. Beckley lay down any different rules, they have been discredited and overthrown by the later decisions.

A further conclusion to be reached is that in the case of a boundary of land consisting of four lines, two of the corners of which are extant and connected by one of the lines, a mistake in the call for the course of such line and the necessity of preserving the shape or figure of the boundary as shown by the original plat are sufficient circumstances to justify and to require a departure from the course called for as to the line opposite to such line. And a still further conclusion to be reached is that the nature of the contingency in which resort should be had to the reversing process in making a location of a portion of a boundary of land, precipitated by the four cases referred to above, is this: Whenever it is proper, after a consideration of all the circumstances, to locate the lines of such portion of a boundary of land in accordance with the courses called for, and they cannot be so located without resorting to such process, then, in that event and to the extent that is necessary to resort thereto, such resort should be had. It is simply as an aid to a course location in a case in which such location is proper, and in no other contingency is it to be gathered from said cases that it is proper to resort to such process. It is not to be gathered therefrom, or any other Kentucky cases, that resort should be had thereto, because a location so made would be against the claimant, and would cut down the quantity covered by the boundary from an amount greatly in excess to an amount only slightly in excess of the amount called for. The small part that the circumstance as to quantity figures in locating

141 F.—49

the boundary of a tract of land is indicated in the quotation made above from the opinion in the case of Beckley v. Bryan. To the same effect is the statement by Judge Robertson in the case of Mercer v. Bate:

"The simple fact of surplus extending to even more than a duplication of Madison's proper quantity would not be sufficient to establish such a mistake."

The only instances in which a location against the claimant—one cutting down the quantity—was preferred in said four cases were two. One was where the two alternative locations were each according to courses called for and there was no circumstance indicating which should be preferred. This was the case in Bryan v. Beckley and Pearson v. Baker. The other was where a location not according to course called for of the line of a boundary of land consisting of four lines opposite to the line connecting two extant corners thereof was preferred to either one of two alternative locations according to course, one of which placed it on the outside and the other on the inside of the location made; the preference shown being because of a mistake in the course called for as to the line connecting the two extant corners, to which it was opposite, and it made the boundary conform to the shape or figure of the plat. This was the case of Preston v. Bowmar.

It remains, then, to apply the rules gathered and deductions drawn from the decisions which we have considered in detail. And first comes what I may term the "North Carolina rule" in both its aspects, affirmative and negative. It is certain that this rule in its affirmative aspect does not require a resort to the reversing process in locating the three lines in question of the Ledford boundary. Neither one of these lines has any advantage over any one of the others in point of certainty. Judge Hobson, in Creech v. Johnson, says that the fact that no timber is called for in the fourth, fifth, and sixth corners and that a mistake was made as to the distance of the first and second lines "would seem to indicate that this patent was perhaps laid out by protraction and that the surveyor did not in fact run the lines." The surveyors who testified herein expressed their opinions that the third, fourth, fifth, and sixth lines were not run at the time of the making of the boundary. Counsel on both sides seem agreed as to this. And I have no doubt that such is the case. If, then, the fourth, fifth, and sixth lines were not run at said time, but were laid off by protraction, in the very nature of things, neither one of these three lines could have an advantage over either one of the others in point of certainty. Said rule, therefore, does not call for the use of the reversing process in locating said lines, and it cannot be claimed that it is favorable to either the second, third, or fourth hypothesis, each one of which makes use of the reversing process to a more or less extent. Indeed, in its negative aspect, which is that resort should not be had to the reversing process unless the posterior line has an advantage over the prior line in point of certainty, it forbids a location according to either one of these three hypotheses, and requires that it should be located in accordance with the first one. And, looking at the matter

from the standpoint of reasonableness alone—i. e., apart from authority—there is something to be said in its favor. The location of a boundary of land is nothing more nor less than tracking the surveyor who made it. By tracking him I mean following the boundary which he has made according to its true intent and meaning, whether it is made by actual survey or protraction only. Here, as I endeavored to make plain in the former opinion, there is no difficulty in tracking the surveyor from the beginning to the fourth corner of the Ledford boundary. It is true that the calls for the first, second, and third lines vary somewhat from the monuments called for; but the monuments are there and there is no difficulty in finding them. As to the rest of the distance—i. e., from the fourth to the beginning corner—whilst the surveyor cannot be tracked by monuments, he can be tracked by his calls for course and distance as to the fourth and fifth lines and for the beginning corner as to the sixth line. It is true that the call for the latter varies from the course and distance called for. But this is nothing more than was the case with the first line, and with the second line as to distance, and the third line as to course. If there was no hesitancy in departing from these calls to this extent, why should there be any hesitancy in departing from the call for the sixth line as to course and distance? Where, then, does any necessity come in to require one, in tracking the surveyor from the beginning corner in the direction called for, to quit going forward at any point and attempt to track him in the opposite direction? If there is no uncertainty in so tracking him, what consideration is there to require such procedure? Is there any beyond the fact that thereby a quantity of land is brought within the boundary in excess—greatly in excess—of that called for? There is not. But that fact is not a consideration sufficient to require such procedure; for the location of a boundary of lands is not to be affected by the quantity embraced within, save in the event of some uncertainty, and according to the position reached there is no uncertainty in tracking the surveyor from the beginning corner back to same in the direction called for.

Such, I take it to be, is the line of reasoning along which the North Carolina rule would forbid a location of the lines in question of the Ledford boundary in accordance with the second, third, and fourth hypotheses, and require a location in accordance with the first one. Of course, it leaves out of consideration any effect that should be given to the figure or shape of the original plat. And it is not without Kentucky authority in its support. I refer to the case of Simpkins v. Wells, 42 S. W. 348. In that case the boundary whose location was involved contained 11 lines and had 11 corners. The first 3 corners were marked by timber called for, and were known. Nothing was called for as to the other corners. Each other line, however, was designated by course and distance. The call for the last line was "N. 20 poles to the beginning." The real courses and distances for the first and second lines, connecting the known corners, did not correspond to the calls, and hence the latter had to yield to the former. The other nine lines could be run according to courses and distances called for, except the last one. That, in order to close the

survey, pursuing the direct order, had to be run N. 5° 10′ E. 141 poles, instead of N. 20 poles, as called for. It was held that the location should thus be made, notwithstanding that it appeared that by running the last five lines in reverse order and the reverse of the courses and according to the distances called for, and inserting two other lines of certain courses and distances between said last five lines and the first six, the survey would close, all the lines save the first two connecting the extant corners would be located according to courses and distances called for, and the figure of the boundary would be made to resemble the surveyor's original plat.

Seemingly a direct authority in support of this position was the case of Alexander v. Lively, supra. Judge Guffy said:

"But appellants contend that to run it [the last line] only 20 poles the call would not close; but we suggest that the call is also to the beginning, and the rule of law has long been held by this court that both courses and distances give way to natural objects, and by that rule, if the call had been S. such a distance to the beginning, that the call to the beginning would prevail. You must go from this lost corner to the beginning, regardless of courses and distances. This fact is recognized by all, else you would have no boundary."

Counsel for defendant contend that this case "practically overrules all preceding cases." It must be conceded that seemingly it is out of touch with the earlier decisions of the same court which we have considered herein. No reference is made in the opinion to any of them. The case of Harry v. Graham, therefore, instead of being in support of the location made in Creech v. Johnson, as cited by Judge Hobson, is directly in the teeth of it.

But, though the North Carolina rule in its negative aspect requires a location in accordance with the first hypothesis, it cannot be followed here, because it is contrary to the deductions drawn from the relevant Kentucky authorities, leaving to one side Simpkins v. Wells, which require, if possible, a course location, unless there are some circumstances bringing the mind to a contrary conclusion; and there are in this case two possible course locations, and though, as we shall see, there are circumstances which bring the mind to a conclusion contrary to a course location, those circumstances do not bring it to a conclusion in favor of the first hypothesis. The two possible course locations are locations in accordance with the third and fourth hypotheses. That in accordance with the third hypothesis is favorable to plaintiff, the claimant of the boundary in question; whereas that in accordance with the fourth hypothesis is against him. If, then, we were shut up to these two hypotheses we would be bound to choose the fourth one. This would be required by the decision in Bryan v. Beckley and Pearson v. Baker. But we are not shut up to these two hypotheses. There are circumstances in this case which bring the mind to a conclusion against a course location according to either hypothesis, and they bring it to a conclusion in favor of the second hypothesis, which preserves the courses and distances called for as to the fourth and sixth lines, and disregards the course and distance called for as to the fifth line. They are the very two circumstances which existed in Preston v. Bowmar, and caused a location of the

third line of the boundary involved therein in disregard of the call for said line as to course and distance. These two circumstances were a mistake as to the call for the first line—the line opposite to the third—as to both course and distance, and the necessity of disregarding said call in order to make the location of said boundary conform to the shape or figure of the original plat.

The boundary herein consists of six lines, but for the purpose of its true location it may be treated as one of four lines. The first two lines make a slight notch or offset in the southeast corner thereof. With the exception of that notch or offset, the boundary is that of a four-sided body of land. This treats the course of the top of Cumberland Mountain as a straight line, instead of zigzag, as it really is. It is so treated in the plat constituting a part of the certificate of survey. To make it a boundary of four lines, all that is necessary to do is to extend the line coinciding with the top of Cumberland Mountain northeast with said top until it intersects with the sixth line extended. This would throw out the first and second lines and remove said notch or offset. The third and fifth lines, therefore, are opposite, and so are the fourth and sixth. Now, the course called for the third line is S. 60° W. The real course from the third to the fourth corner by a straight line is about S. 72° 30′ W., a variation of about 12° 30′ to the right, or south. The course called for of the fifth line is N. 55° E. Locating it in accordance with the second hypothesis will cause its course to be N. 67° 54′ E., a variation of 12° 24′ to the right, or south. This is according to Duffield. According to Kirby the result is substantially the same. The second hypothesis imparts, therefore, the mistake in the third line to its opposite line, the fifth; and, in view of the conceded fact that the fourth, fifth, and sixth lines were never actually run, this is what one would expect.

Then, as to the figure made by the boundary: Treating it as one of four lines, its figure is that of a trapezium, bordering on a nonrectangular parallelogram. As shown by the plat forming a part of the certificate of survey, leaving out said notch or offset, one would say that it is such a parallelogram. Such appears to be its figure in the plat incorporated in the opinion in Creech v. Johnson. The third hypothesis increases the sixth line from 3,100 poles, called for, to 5,518 poles, an excess of 2,382 poles. The fourth hypothesis cuts the fourth line down from 3,200 poles to 296 poles, a diminution of 2,904 poles. This is according to Duffield. According to Kirby it is substantially the same. According, therefore, to the third hypothesis, the sixth line is nearly twice as long as the fourth. It only lacks 882 poles of being so. According to the fourth hypothesis the sixth line is over ten times as long as the fourth. How far away from nonrectangular parallelogram a location according to either of these two hypotheses will throw the figure of the boundary is evident from the disproportion which they cause between the lengths of these two lines which according to the calls and as shown on the original plat are nearly equal. The fourth one throws it farther away than the third. It almost makes a triangle out of it. I conclude, therefore, that these two circumstances are sufficient to bring the mind against

a course location of all three of the lines in question, and in favor of a location according to the second hypothesis, which is a course location save as to the fifth line. And I hold that a location in accordance with said hypothesis is the correct location of said lines. The only authority that can be relied on in support of the fourth hypothesis, which is the one that defendant contends for, is the case of Bryan v. Beckley. That case, however, is discredited in so far as it decided the particular question involved therein, to wit, the effect that should be given to the fact that there was a mistake in the course called for as to the fourth line upon the location that had been made in Beckley v. Bryan, by the shortly subsequent case of Preston v. Bowmar, backed up as it is by Mercer v. Bate and Blight v. Atwell. Besides, there is no indication that the location of the second line in accordance with the course called for, notwithstanding the mistake as to course in its opposite line, had any effect, or was regarded as having any effect, on the figure of the boundary as shown by the original plat. This circumstance, to which great importance is attached by the Court of Appeals of Kentucky and which exists in this case, did not exist in that case. And this difference between the two cases is sufficient in itself to remove that case from any controlling effect on the disposition of this. As in Blight v. Atwell, so here, the figure of the original plat is sufficient to require a noncourse location, and that according to the second hypothesis.

Counsel for plaintiff rely on the case of Asher v. Vansant (Ky.) 67 S. W. 374, in support of their contentions herein, in addition to certain of the decisions heretofore considered. I have not found it necessary to consider this case in detail so as to determine its exact bearing. Counsel for the defendant refer to the statement therein by Judge Burnam that the "case of Beckley v. Bryan, which was decided in 1801 and which is reported in Litt. Sel. Cas. 100, and in Ky. Dec. (Sneed) 91, which is the leading case upon this subject," to wit, the ascertainment of the location of the lost corners of a survey when one or more of them can be shown. This is in a certain sense true of Beckley v. Bryan. It, however, is not to be treated as an indorsement of Bryan v. Beckley, over against Preston v. Bowmar, Mercer v. Bate, and Blight v. Atwell, or as qualifying to any extent the deduction to be made from those cases.

The location of the fourth and sixth lines according to this hypothesis should take into consideration variation in the magnetic needle from the true meridan between 1845 and the present time. According to Duffield that variation is 1° 56' to the right. According to Kirby it is 2° 24'. There is not a very great difference here; but, owing to the testimony of Kirby that the variation allowed by him is that allowed by the local surveyors, I think best to conform to this local usage.

The remaining matter left open for determination is that as to the location of the patents senior to the Ledford patent. Counsel for defendant have urged that complainant's bill should be dismissed because the plaintiff has not proven their location, and thus shown that defendant is claiming land owned by him. Of course, complainant is

not entitled to relief against defendant unless the latter is claiming land owned by him; and it cannot be said from this record that defendant is so doing, unless it shows that some part of the portion of the Cawood patent which he is claiming is within that portion of the Ledford patent located according to the second hypothesis outside of senior patents. This it does not show, save so far as the opinion of the witness Will Ward Duffield is concerned. He has expressed the opinion that there are from 5,000 to 7,000 acres of the Cawood patent not covered by senior patents, and that about one-half of this is within the Ledford patent outside of senior patents. If so, then defendant is claiming 2,500 to 3,500 acres of the Ledford patent owned by complainant. Possibly this evidence is not admissible. Possibly, in view of the difficulty of otherwise proving the fact, it ought to be admitted. But, even if it is inadmissible, I do not think that complainant's bill should be dismissed for want of evidence of the fact. It could hardly be proved without the assistance of this court. Had complainant applied for such assistance heretofore, it would have been denied. It should not have been rendered in advance of a determination of a location of the patent. Otherwise, much labor and expense would have been incurred to no purpose.

In view, however, of this position of defendant, if it is adhered to, I will send the case to a commission to ascertain and report what the fact is, and enter no decree until it is determined. If defendant indicates a waiver of the position, it will not be so referred.